

FILED
CHARLOTTE, NC

MAR 27 2012

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | DOCKET NO. 5:12CR13-RLV |
| ) | |
| ) | BILL OF INFORMATION |
| v. ) | |
| ) | Violations: |
| ) | 18 U.S.C. § 1347 |
| BETTY ANN COOK ) | 18 U.S.C. § 1349 |
| ) | 18 U.S.C. § 1956(h) |

THE UNITED STATES ATTORNEY CHARGES:

At the specified times and at all relevant times:

### Introduction

1.  BETTY ANN COOK was the owner and operator of Families First Home Health Care, a home health care company located in Alleghany County, North Carolina.

2.  Company #1 was authorized to provide Personal Care Services (PCS) and was enrolled as a provider with the North Carolina Medical Assistance Program (hereinafter referred to as "Medicaid" or "Medicaid Program") from September 2006 to October 2010.

3.  PCS generally include the services of an aide in the recipient's private residence to assist with the recipient's personal care needs directly linked to a medical condition, such as bathing, dressing, toileting, ambulating, and eating.

4.  Medicaid is a state-administered program aided by federal funds. Medicaid is designed to provide medical assistance for certain low income individuals and families. Covered services include Personal Care Services.

5.  The Division of Medical Assistance, North Carolina Department of Health and Human Services (herein referred to as "DMA"), administers the Medicaid Program and oversees personal care service providers throughout the state who receive payments from Medicaid.

1

6. Medicaid is a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).

7. Medicaid policy requires each recipient seeking PCS must undergo an in-home, face-to-face assessment by a registered nurse (RN), who must be certified in PCS, to determine eligibility for the request services. The RN's assessment is documented in a Physician Authorization and Certification of Treatment (PACT) form. The PACT form then must be reviewed and approved by a physician prior to the provision of PCS services. Medicaid policy requires PCS providers, such as COOK and Company #1, to maintain PACT forms in order to support and justify claims to Medicaid.

8. Medicaid policy also requires PCS providers to maintain timesheets, signed by both the aide who provided the PCS and the Medicaid beneficiary, documenting the date, time and type of services provided.

## Schemes to Defraud

9. From in or about December 2006 through in or about October 2010, COOK and others perpetrated a scheme to defraud Medicaid by submitting and causing to be submitted false and fraudulent claims to Medicaid seeking reimbursement for PCS which:

   a. were not provided;

   b. were not authorized by a physician;

   c. were not based upon a valid in-home eligibility assessment performed by a qualified registered nurse.

### A. Services Not Rendered

10. Beginning in or about 2006 and continuing to in or about 2010, COOK, PCS aides, and Medicaid recipients engaged in a scheme to defraud Medicaid by billing for PCS

2

services which were not rendered and then generally splitting the Medicaid reimbursement payments ("fee splitting") between COOK, the PCS aide, and the Medicaid recipient.

11. Pursuant to this scheme, COOK paid PCS aides to complete timesheets falsely stating that the aide had provided PCS services to Medicaid recipients. For example, from in or about 2007 to in or about 2010, COOK and co-conspirator #1 (CC#1) generated false timesheets bearing CC#1's signature as the rendering PCS aide when, in fact, CC#1 never provided PCS services through COOK's company. During that same time period, COOK issued checks totaling at least $2,000 to CC#1 as payment for CC#1's signing of false timesheets.

12. COOK also paid Medicaid recipients to complete similarly fraudulent timesheets falsely stating that the recipient had received PCS services through Company #1. COOK then relied upon these false timesheets to support fraudulent claims submitted to, and reimbursed by, Medicaid.

13. In order to justify and document the illegal payments to Medicaid recipients pursuant to the fee-splitting scheme, COOK frequently claimed on payroll, business and financial documents that the Medicaid recipient was an employee of her home health care company during the same time that the recipient allegedly received PCS services from COOK's company.

14. As a result of the fee-splitting scheme, from in or about 2006 to in or about 2010, COOK and Company #1 submitted false and fraudulent claims to Medicaid resulting in payments in excess of $150,000.

15. In addition to the fee-splitting scheme, COOK submitted false and fraudulent claims to Medicaid for services not rendered even when the claimed aide and claimed Medicaid

3

recipient were not participants in the fraud scheme and did not receive illegal compensation from COOK.

**B. Fraudulent Claims For PCS Services Not Authorized By a Physician**

16. COOK, through Company #1, submitted false and fraudulent claims to Medicaid for PCS services allegedly provided to Medicaid recipients when those recipients did not qualify for PCS services and were never approved by a physician to receive such services.

17. In addition to falsifying time sheets in order to support fraudulent billing, COOK copied, altered and falsified physician signatures and approvals and instructed other co-conspirators to do the same on Medicaid-required PACT forms in order to justify fraudulent billing. For example:

    a. On or about July 30, 2009, COOK, through Company #1, submitted a PACT form for Dr. M.D.'s signature seeking Dr. M.D's approval to provide PCS services to Medicaid recipient E.L. Dr. M.D. checked the box on the form for denial of services and signed the form on July 30, 2009. Additionally, on the fax coversheet returning the denied PACT form to COOK and Company #1, Dr. M.D. wrote, "He doesn't qualify for PCS as he is unimpaired for bathing, dressing, toileting (not incontinent), transfers, walking and feeding. PCS is not supposed to be a housekeeping service – which is apparently what he needs. You could refer him to the Council on Aging for chore services." Despite this clear denial of authorization for services, COOK altered the PACT form to delete the check mark made by Dr. M.D. from the denial box, to place a check mark in the approved box and altered Dr. M.D.'s signature date to July 13, 2009. Even though E.L. was not approved to receive PCS services, COOK submitted false and fraudulent claims to

4

Medicaid for services allegedly provided to E.L. between June 8, 2009, and August 15, 2009, resulting in total Medicaid payments in excess of $2,000.

b. On or about May 18, 2009, COOK, through Company #1, submitted a PACT form for Dr. M.D.'s signature seeking Dr. M.D's approval to provide PCS services to Medicaid recipient L.W. Dr. M.D. checked the box on the form for denial of services, circled the phrase "does NOT" qualify for services on the form, wrote "DENIED" on each page of the PACT form and signed the form on May 20, 2009. Additionally, on the fax coversheet sending the denied PACT form back to COOK and Company #1, Dr. M.D. wrote "1. No one contacted me for permission to do an eval on [L.W.] 2. She does not qualify for PCS . . ." Despite this clear denial of authorization for services, COOK and others acting at her direction thereafter altered the PACT form to delete the check mark made by Dr. M.D. from the denial box, delete the circle around the phrase "does NOT" and delete the "DENIED" notation from each page. Even though L.W. was not approved to receive PCS services COOK submitted false and fraudulent claims to Medicaid for services allegedly provided to L.W. between April 1, 2009 and July 20, 2009, resulting in total Medicaid payments in excess of $3,000.

18. In other instances, COOK, through Company #1, simply submitted false and fraudulent claims for services allegedly rendered to Medicaid recipients knowing that the recipient had not been approved by a physician to receive PCS services.

19. From September 2007 to May 2010, COOK, through Company #1, submitted false and fraudulent claims to Medicaid for alleged PCS services provided to recipients who

5

never qualified to receive such services, resulting in total payments from Medicaid in excess of $48,000.

### C. Fraudulent Claims for PCS Services Based Upon False and Fraudulent Nurse Assessments

20. Even though Medicaid policy required PCS providers such as COOK and Company #1 to retain a PCS-certified Registered Nurse to perform in-home assessments of Medicaid recipients, COOK did not employee such a nurse at Company #1 for significant periods of time.

21. Instead, COOK and others at Company #1 under COOK's direction, forged patient information and nurse signatures in order to make it appear that the Medicaid recipient qualified for PCS services. Upon receiving authorization by primary care physicians (based on the false and fraudulent assessments), from in or about September 2006 to in or about September 2009, COOK, through Company #1, submitted false and fraudulent claims to Medicaid for alleged PCS services, resulting in total payments from Medicaid in excess of $120,000.

22. For example:

   a. COOK employed nurse R.M. for one or two days in August 2006. After at most two days of work, nurse R.M. left Company #1 due to her concerns about COOK and Company #1. COOK and others acting at her direction, however, forged nurse R.M.'s signature on PCS assessments dated August 29, 2006, to October 8, 2007, resulting in total payments from Medicaid in excess of $102,000 based upon that initial fraudulent assessment.

   b. COOK employed nurse D.L. for a single day in May 2008. Nurse D.L. similarly left Company #1 after a single day of work due to her concerns about COOK and Company #1. COOK and others acting at her direction, however, forged nurse

6

D.L.'s signature on PCS assessments dated May 20, 2008 to September 16, 2008, resulting in total payments from Medicaid in excess of $16,000 based upon that initial fraudulent assessment.

## Financial Transactions

23. From in or about December 19, 2006 to in or about October 8, 2010, COOK submitted false and fraudulent claims to Medicaid seeking payment for PCS services allegedly provided by CC#1 when, in fact, CC#1 did not provide any of the claimed PCS services. COOK, thereafter, received payments between January 9, 2007, and October 13, 2010, in excess of $29,000 from Medicaid into BB&T account XXXXXXXXX0097, held in the name of Betty Ann Cook. These payments were the proceeds of COOK's scheme to defraud Medicaid through the submission of claims which rely upon false and fraudulent timesheets completed by CC#1.

7

## COUNT ONE

## 18 U.S.C. § 1349
## (Health Care Fraud Conspiracy)

24. The United States re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 23 of the Bill of Information, and further alleges that:

25. From in or about 2006 through in or about October 2010, in Alleghany County, within the Western District of North Carolina, and elsewhere, the defendant,

BETTY ANN COOK

knowingly conspired, confederated and agreed with CC #1 others known and unknown to the United States Attorney to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money and property owned by and under the custody and control of any health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

All in violation of Title 18, United States Code, Section 1349

## COUNT TWO

## 18 U.S.C. § 1956(h)
(Money Laundering Conspiracy)

26. The United States re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 23 of the Bill of Information, and further alleges that:

27. From in or about 2007 to in or about 2010, in Alleghany County, within the Western District of North Carolina, and elsewhere, the defendant

BETTY ANN COOK

did knowingly combine, conspire, and agree with CC#1 and others known and unknown to the United States Attorney to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to commit health care fraud, with the intent to promote the carrying on of specified unlawful activity, that is conspiracy to commit health care fraud, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

All in violation of Title 18, United States Code, Section 1956(h)

9

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

28. Notice is hereby given of the provisions of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by section 981(a)(1)(C). The defendant has or had a possessory or legal interest in the following property that is subject to forfeiture in accordance with section 982 and/or section 2461(c):

    a. all property involved in the violations alleged in this bill of indictment;

    b. all property which is proceeds of such violations; and,

    c. in the event that any property described in (a) or (b) cannot be located or recovered or has been substantially diminished in value or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant, to the extent of the value of the property described in (a) and (b).

29. The following property is subject to forfeiture on one or more of the grounds stated above:

    a. All currency and monetary instruments which were received during, involved in or used or intended to be used to facilitate the crimes alleged in this bill of indictment, including but not limited to the sum of approximately $325,000.00

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

_[signature]_
KELLI H. FERRY
ASSISTANT UNITED STATES ATTORNEY

_[signature]_
LAURA LANSFORD
SPECIAL ASSISTANT UNITED STATES ATTORNEY

10